[No. 35505.   Department One.   July 13, 1961.]

DAVID A. FRITTS *et al., Appellants,* v. EDGAR W. McKAY *et al., Respondents.**

*Roy L. Ross* and *C. R. Pomeroy,* for appellants.

*McGregor, Halstead & Sheeran,* for respondents.

WEAVER, J.—Plaintiffs (appellants) Willene B. Fritts and David A. Fritts, mother and twenty-seven-year-old son, commenced this action against defendants (respondents) Edgar W. McKay and wife for $32,033.82 damages, the result of defendants' alleged fraud in the sale of an asparagus farm to plaintiffs. Although not a party to the action,

*Reported in 363 P. (2d) 808.

Austin Fritts, husband and father of plaintiffs, participated in the transaction.

The claimed damages are: (1) $15,000—the "difference between the reasonable market value at the time of said sale and the reasonable value of said property at said time if it had been as represented"; (2) $16,543.82—estimated loss of profit—the difference between what the property should have produced and what it did produce for the 1957-1958 crop years; and (3) $490—the amount plaintiffs expended to install a new drainage line.

The trial court found plaintiffs' evidence insufficient to warrant a verdict, discharged the jury, and dismissed plaintiffs' complaint with prejudice; it is, therefore, necessary that we review the facts in some detail.

Defendants McKay purchased an 80-acre farm near Grandview in 1948 or 1949. Not having had previous experience raising asparagus, Mr. McKay, in the early part of 1955, consulted experienced asparagus farmers concerning planting methods. Among those consulted were the Fritts. Mr. McKay testified that in 1955 the Fritts "were on the place, just over to see how I was planting it." Having planted 35 acres in 1955, Mr. McKay planted an additional 15 acres of asparagus in the spring of 1956.

Mr. and Mrs. Fritts, qualified by their counsel as expert asparagus farmers, had raised asparagus since 1939. Mrs. Fritts had served on a five-member consultation board of the Department of Agriculture "relative to certain statistics in the growing of asparagus." The Fritts were farming 120 acres at the time of trial.

In the fall of 1956, Mr. McKay visited the Fritts' farm to inquire about "a good arrangement for the leasing" of his asparagus farm. Sale of the property was not discussed.

In December, 1956, Mr. Harry Sherwood, a salesman for Mr. Bert C. Ooms, a real estate broker in Sunnyside, Washington, called on Mr. Austin Fritts "to see if *he* would be interested in selling *his* own place." (Italics ours.) At that time, Mr. Fritts told Mr. Sherwood that the McKay farm was for sale; how old the stand of asparagus was; and how many acres were in each planting. Prior to this meeting,

neither Mr. Sherwood nor Mr. Ooms knew the McKay land was for sale; it had not been listed with them.

Mr. Sherwood testified that Mr. Austin Fritts was interested in buying the McKay farm "but it was a matter of a way to finance it." Mr. Ooms testified:

". . . our first contact with the buyer was they wanted the ranch, not that we were selling it, and we were working out the finances; that was our job."

The exact chronology of events—between the time Mr. Sherwood first talked to Mr. Austin Fritts and January 17, 1957, the day the McKays signed the earnest-money receipt and agreement—is not clear from the record. We have, therefore, grouped the activities of each actor during this period.

*Mr. Sherwood.* After talking with Mr. Austin Fritts, Mr. Sherwood went directly to the McKay farm. He testified: "It was in fern; it had not been rod weeded yet." (The "fern" of an asparagus plant indicates the spacing of the stand and the quantity of the expected crop. It is plowed under in the fall or the spring.) Two or three weeks before the sale was consummated, he started to arrange the financing of the sale. He contacted the Prosser Bank and certain individuals to see if they would be interested in financing the Fritts' purchase of the McKay property. He testified:

"I don't remember that it had to be a crop mortgage, it was any type of mortgage that was suitable and would furnish the amount of money that was necessary to complete the deal, so I don't say it was a crop mortgage; it was any way it could be financed."

*The Fritts.* On two occasions, three or four days apart and two or three weeks before they signed the earnest-money receipt and agreement, the Fritts inspected the McKay farm. The fern had been plowed under; the ground was frozen. (Called as an adverse witness, Mr. McKay testified that he had "turned the fern under" around Christmas time.) When asked if she had endeavored to check the production records of the McKay property, Mrs. Fritts replied: "Yes, I went to the Prosser Pack and asked for the production records there."

On one of their inspection trips, the Fritts were accompanied by Mr. Carl Weihl, an official of the Birdseye Company who had "an over-all knowledge" of asparagus farming. As a result, the company advanced an undisclosed amount of money for which a crop mortgage was given. It was not "for the entire sum of $15,000."

*Mr. Ooms.* After Mr. Sherwood had informed him that the McKay property was for sale, Mr. Ooms telephoned Mr. McKay at Othello—where he was then living—and obtained a verbal listing to sell the farm. A written listing was not requested. Mr. Ooms did not remember how many telephone conversations he had with Mr. McKay; the conversations, however, were limited to price, the amount of taxes, and the terms of sale.

January 16, 1957, Mr. Ooms and Mr. Sherwood went to the Fritts farm. Mrs. Fritts and her son signed an earnest-money receipt and agreement to purchase the McKay land.

Mr. Ooms did not inspect the McKay property in 1957. He testified, however, that

". . . I can remember perhaps one thing that was pertaining to the asparagus; I mentioned [to the Fritts] I had been by this place many times prior to the sale, and both the south and west sides of the ranch and from the road it appeared to be a very nice stand."

*The McKays.* Mr. McKay testified that Mr. Ooms telephoned him "the night before he brought the earnest money receipt up [to Othello]."

Mr. Ooms and Mr. Sherwood presented, and the McKays signed, the earnest-money receipt in Othello on January 17, 1957. The Fritts had, of course, signed it the day before. Mr. Ooms and Mr. Sherwood testified that there had been no conversation between them and the McKays concerning the stand of asparagus at the time they presented the earnest-money receipt to the McKays for signature. To this point, the McKays had not discussed the transaction with the Fritts.

The earnest-money receipt and agreement—a printed form supplied by a title company—contained two provisions which we notice: first, it provided:

"This deal is subject to the purchaser's ability to obtain a crop mortgage in the amount of $15,000.00."

and, second:

"The sale shall be closed . . . within 15 days after . . . completion of financing . . . but in any event not later that 2/10/57."

The final real-estate contract, dated February 11, 1957, and acknowledged by the notary February 13, 1957, was signed in Mr. Ooms' office by the parties, who met for the first time during the transaction. The real-estate contract does not provide for a crop mortgage. It does provide that, since "the purchasers are excellent asparagus farmers," they "will put approx. 30 acres of tillable land in asparagus" in the spring of 1957.

Five of plaintiffs' (appellants') seven assignments of error spring from the court's ruling, expressed as follows:

". . . if the evidence you propose to submit was in *corroboration of representations* made preceding the earnest money agreement, then it will be admissible *but only after you have produced testimony on the preceding representation.* One further thing—if there is any demonstration if the earnest money agreement or contract are submitted that any changes or alterations were made in the contract because of representations made subsequent to the earnest money agreement, that too, would be admissible for the purpose of demonstrating the change in the contract, whereas [if] the terms of the earnest money agreement and contract are substantially the same, then it would not be admissible." (Italics ours.)

The essential link, missing in plaintiffs' chain of argument, is the complete absence of any testimony—or offer of proof—that Mr. Ooms, Mr. Sherwood, or Mr. McKay represented the *quality* of the stand of asparagus to them, prior to their signing the earnest-money receipt. Mr. and Mrs. Fritts, who testified at length, did not mention the subject. David Fritts, the son, testified he had not discussed the quality of the asparagus stand with Mr. McKay, prior to signing the real-estate contract.

On the other hand, Mr. Ooms, called as a witness by plaintiffs, testified he had no recollection of discussing the

stand of asparagus with the Fritts. We are not overlooking the fact that Mr. Ooms stated that "from the road it appeared to be a very nice stand." In the circumstances disclosed by the record, this remark does not rise to the dignity of a representation, upon which plaintiffs relied, that is sufficient to present a jury question.

Mr. Sherwood testified, "I had no reason to sell them on how good the stand was. They told me about the property."

There is a complete absence of proof (or offer of proof) that any representations were made to plaintiffs by defendants, or by anyone in their behalf, regarding the quality of the asparagus stand, *prior* to plaintiffs' signing the earnest-money receipt and agreement. The trial court, therefore, did not err when it failed to admit discussions (or possible discussions) between defendants McKay and Messrs. Ooms and Sherwood, at *or after* the time the earnest-money receipt was signed by McKays, since the earnest-money receipt had already been signed by plaintiffs. Plaintiffs' first assignment of error is without merit.

Plaintiffs' third assignment of error is directed to the dismissal of their complaint, claiming that

" . . . there is sufficient evidence to raise a question of fact for the jury as to whether or not Mr. Ooms and/or Mr. Sherwood had authority from defendants, implied from custom and usage, to make representations to plaintiffs concerning the nature of the asparagus stand on defendants' farm."

This assignment of error is without merit for two reasons:

(1) The record does not disclose a situation that is sufficient to relieve plaintiffs of the necessity of pleading custom and usage, which they did not do. *Redmon v. Andrews*, 147 Wash. 390, 266 Pac. 178 (1928); *Wilkins v. Kessinger*, 90 Wash. 447, 449, 156 Pac. 389 (1916), and cases cited.

(2) There is no evidence that Messrs. Ooms and Sherwood represented to plaintiffs the nature of the asparagus stand on defendants' farm, prior to plaintiffs' signing the earnest-money receipt. The record discloses that the transaction was initiated by plaintiffs and Messrs. Ooms and Sherwood before defendant McKay knew of it; his partici-

pation was limited to a later telephone conversation with Mr. Ooms, in which he gave an oral listing of his farm and discussed "price, amount of taxes and . . . terms." Under these circumstances, a discussion of the actual or apparent authority of Messrs. Ooms and Sherwood would be only advisory.

Plaintiffs' counsel made the following offer of proof:

"David Fritts will testify that at the time of the consummation of the real estate contract that conversation transpired wherein Harry Sherwood in the presence of the defendant, Mr. McKay, stated that the Fritts had asked him about the stand of asparagus and was it true that there was a good stand of asparagus, to which Mr. McKay answered in the affirmative."

■ We cannot agree with plaintiffs that the offer of proof "constituted *a ratification of previous* representations made to plaintiffs concerning the stand of asparagus on defendants' farm." (Italics ours.)

Ratification presupposes that the acts, ratified or adopted, were performed by one who purported to act on account of another. *Kraft v. Spencer Tucker Sales*, 39 Wn. (2d) 943, 954, 239 P. (2d) 563 (1952), and cases cited. There is no evidence of a "preceding representation" by Messrs. Ooms and Sherwood; hence, the proffered evidence is not admissible under the doctrine of ratification.

Plaintiffs' remaining assignments of error are directed to the court's rejection of its offer of proof (quoted *supra*) that relates to an alleged representation made by Mr. McKay at the time the real-estate contract was signed. Plaintiffs urge that the proof is admissible because the contract constituted a new transaction, since, by its terms, the earnest-money receipt expired the previous day, and, since the contract contained a provision requiring plaintiffs to plant an additional thirty acres of asparagus—a provision that was not in the earnest-money receipt.

We do not find it necessary to discuss these contentions, for, assuming *arguendo* that the statement was made as set forth in the offer of proof, the court did not err when it dismissed the action at the end of plaintiffs' case.

420

■ One of the essential elements of a claim of fraud is reliance. *Webster v. Romano Engineering Corp.*, 178 Wash. 118, 34 P. (2d) 428 (1934). There is no evidence in the record that plaintiffs relied upon the statement. In truth, under the unique facts of the case, the evidence is to the contrary.

The judgment is affirmed.

HILL, ROSELLINI, FOSTER and HUNTER, JJ., concur.